**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

EXPLORICA, INC.

          Plaintiff,

   v.

ELDERHOSTEL, INC.
d/b/a EXPLORITAS,

          Defendant.

Civil Action No.  09-11719

**MEMORANDUM IN SUPPORT OF PLAINTIFF**
**EXPLORICA, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Explorica, Inc. ("Explorica"), owner of the long-standing, registered and incontestable service mark EXPLORICA for tour guide and travel services, files this Memorandum in Support of its Motion for a Preliminary Injunction to prevent Defendant Elderhostel, Inc. from using the confusingly similar mark EXPLORITAS for the same services.

## INTRODUCTION

Explorica has used the distinctive service mark EXPLORICA (the "Mark") to identify itself and its educational travel services continuously since 2000. Explorica has invested tens of millions of dollars establishing, promoting, and protecting the EXPLORICA brand and, as a result, it has developed substantial goodwill in the Mark. Recently, Elderhostel, Inc. ("Elderhostel"), a long-time competitor in the educational travel space, rebranded its travel services from ELDERHOSTEL to EXPLORITAS, a name that is virtually identical to EXPLORICA. At the same time, Elderhostel also expanded from its traditional focus on the over-55 educational travel market, and lowered its minimum participant age to 21. Elderhostel is also redesigning its website and adopting Explorica's innovative social networking approach in an effort to update its image and attract younger customers. Even prior to the changes, however, Elderhostel and Explorica had significant overlapping potential and actual customer bases.

Given that both parties are long-established in the educational travel industry with headquarters just blocks apart in Boston, there can be no doubt that Elderhostel was aware of Explorica's prior use of and rights in the EXPLORICA Marks at the time it chose to adopt a confusingly similar mark and logo. Elderhostel is also deemed to be on at least constructive notice of Explorica's rights by virtue of Explorica's incontestable federal registration for the Mark. As such, the Court may infer that Elderhostel's adoption of a confusingly similar mark and logo was intentional.

Elderhostel's actions have and will inevitably continue to cause significant consumer confusion in the marketplace.  Indeed, such confusion has already occurred.  Following Elderhostel's name change, a consumer contacted Explorica—*thinking it was previously Elderhostel*—to schedule a trip for an adult group.  Similarly, a representative of Air France indicated that the company had mistakenly sent an Explorica booking confirmation to "Exploritas."

The harm that is flowing and will continue to flow from Elderhostel's actions is severe. Confusion in the marketplace will result in serious problems for Explorica travelers worldwide— *e.g.*, misdirected communications, confirmations, missed flights, absent hotel reservations, safety concerns—which will reflect negatively on Explorica and erode the goodwill that it has worked hard to establish.  In addition, misdirected communications that contain proprietary business information inadvertently transmitted to Elderhostel—*e.g.*, an Air France confirmation—place Explorica at a commercial disadvantage.

As set forth more fully below, Explorica is likely to be able to show that Elderhostel's conduct constitutes federal trademark infringement (15 U.S.C. §§ 1114 and 1125(a)) and common law trademark infringement under the laws of the Commonwealth of Massachusetts. As a result, the Court should preliminarily enjoin Elderhostel's use of the EXPLORITAS Mark.

## FACTUAL BACKGROUND

Explorica is a private company founded in 2000 that provides educational travel services from offices around the world.  Declaration of Olle Olsson ("Olsson Decl.") ¶ 4.  It is a market-leader among educational travel service providers with approximately 150 employees and tens of millions of dollars in annual sales.  *Id*.  Over the past nine years, Explorica has provided educational travel services to over 155,000 customers.  *Id.* at ¶ 6.  Explorica designs and offers hundreds of international, educational tour packages that focus on experiential learning and are

led by professional Tour Directors. *Id.* at ¶ 7. Explorica distinguishes itself from its competitors with its unique trip features and social networking platform. For example, Explorica uses a website that connects individuals within tours (through social-media applications such as Facebook and Twitter) and hosts its own branded on-line Tour Diary® application that permits parents and friends to follow a tour group's progress with narrative and pictures. *Id.* at ¶ 9.

Explorica also acts as a one-stop shop for groups to reserve and book travel including, but not limited to, transfers, meals, lodging, and activities that correspond with the specific educational programs. *Id.* at ¶ 7. Explorica uses numerous vendors and agents worldwide who also rely on the distinctive EXPLORICA Marks to direct services to those customers. *Id.* at ¶ 8. Explorica's vendors include over 80 airlines, 2,000 hotels, 1,000 restaurants, 45 bus companies, 20 ferry and cruise lines, 250 Tour Directors, and 150 guides worldwide. *Id.* at ¶ 19. These agent and vendor relationships allow Explorica to offer the highest quality tour experiences at the lowest prices and to quickly resolve any travel-related issues that occur abroad. *Id.* at ¶ 8.

Explorica has three principal customers: teachers, parents, and students. *Id.* at ¶ 11. Explorica's customers also include schools and their administrations, insofar as it is often school officials and teachers who coordinate and must approve student trips. *Id.* at ¶ 12. In addition, Explorica frequently sells its educational travel services to parents and students directly, without an initial contact from a teacher. While the current focus of Explorica's services may be students and teachers, it also runs numerous trips for groups comprised primarily of adults. *Id.* at ¶ 14. In the last nine years, Explorica has provided its services to at least 43,000 travelers over the age of 21 and 14,000 travelers over the age of 50. *Id.* Explorica has run nearly 200 trips for groups with at least 50% of the travelers are over the age of 50 and is approaching 1000 trips for groups where 25% of the travelers fall in that age range. *Id.* at ¶ 15. Programs that currently attract, or

have in the recent past, significant interest from adult travelers include: Explorica Family Tours (designed to appeal to children, teens, parents, and grandparents) (*see id.* at ¶ 16, Ex. E); and Espiritour (religious-themed travel services purchased primarily by adults)(*see id.* at ¶ 16, Ex. F).

### A.    Explorica's Marks

The EXPLORICA brand was initially developed for Explorica at substantial expense. Declaration of Marc Mann ("Mann Decl.") at ¶ 3.  From the outset Explorica has invested a great deal of time, money, and effort to promote its EXPLORICA brand and the goodwill it embodies. *Id.*  For example, every year Explorica distributes approximately 1,000,000 fliers and postcards, 270,000 catalogs and mini-brochures, and 60,000 student application booklets worldwide.  *Id.* at ¶¶ 5-7, Exs. A – M.  Explorica has also used its marks in television spots and newsletter inserts in Travel New England which is available at Logan Airport and other travel-related locations. *Id.*  These efforts also include sending over 1,000,000 emails to customers and potential customers every year.  *Id.* All of these marketing materials prominently feature the EXPLORICA Mark.  *Id.*  In addition, Explorica utilizes its Marks to guide its customers during their trips using billboards, signs on buses and at airports, Tour Director uniforms, information boards in all participating hotels, backpacks, luggage tags, lanyards for participants, and business cards and stationery.  *Id.*

In order to protect its valuable name, Explorica applied for and was granted a federal registration for the EXPLORICA Mark for "tour guide services and travel arrangement services and travel information services provided on a global computer network."  *See* Declaration of Michael T. Jones ("Jones Decl.") at Ex. S (Reg. No. 2,732,669, issued July 1, 2003).  The Mark has since become incontestable, and, as a result, Explorica's registration is conclusive evidence

of (*i*) the validity and distinctiveness of the Mark, (*ii*) Explorica's ownership of the Mark, and (*iii*) Explorica's exclusive right to use the Mark in commerce.[1]

In addition to diligently registering its Marks in numerous jurisdictions, Explorica has consistently protected its marks by sending cease and desist letters to competitors and others who have used confusingly similar marks.  Mann Decl. at ¶ 13.  Until Elderhostel, each such party has respected Explorica's intellectual property rights and ceased its infringing conduct.[2]  *Id.*

### B.        Elderhostel as a Direct Competitor of Explorica

Elderhostel is an educational travel service company headquartered in Boston, Massachusetts and founded in 1975.  Jones Decl. at Ex. B.  Elderhostel is a competitor of Explorica that provides identical educational travel services.  *Id.* at Exs. B – D.  Like Explorica, Elderhostel offers group educational travel programs, led by professional guides with knowledge of the destinations, and full-service travel reservations and booking.  *Id.*  Elderhostel offers group educational tours to at least sixty of the same destinations as Explorica and uses some (likely many) of the same vendors in the United States and abroad to facilitate its educational tours as Explorica.  Olsson Decl. at ¶ 20.  In common destinations, it is likely that both parties use the

---

[1] Explorica also took the additional steps and spent considerable amount of money to protect its marks at home and abroad.  Explorica registered the EXPLORICA word mark with the Commonwealth of Massachusetts for "tour guide services and travel arrangement services and information serviced provided over a global computer network." Jones Decl. at Ex. T (Reg. No. 65038, issued November 12, 2004).  This registration is enough to make the Mark protectable under Massachusetts law.  *See George Guertin Trophy, Inc. v. Guertin Graphics, Inc.*, No. 071610A, 2007 WL 4248084, *4 (Mass. Super. Oct. 11, 2007).  Given the international nature of its services, Explorica also has registered the EXPLORICA Mark in numerous foreign markets.  *See* Mann Decl. at ¶ 10; Jones Decl. at Ex. V. In addition to registering its EXPLORICA word mark, Explorica has common law rights in a design mark comprised of a stylized lower-case "E" with a horizontal axis across the middle.  Explorica has exclusively used the distinctive E Design Mark in commerce since at least 2000.  *Id.*  The E Design Mark is inherently distinctive, but it also has acquired substantial secondary meaning as a result of Explorica's use and marketing efforts.  *Id.* at ¶ 11 . The E Design Mark is the subject of a pending federal trademark application.  Jones Decl. at Ex. U (Serial No. 77,830,804, filed September 21, 2009).  Explorica's numerous registrations and applications reflect the enormous value of the goodwill embodied in its distinctive Mark.

[2] On October 2, 2009, promptly upon learning of the rebranding, Explorica sent Elderhostel a cease and desist letter demanding that it stop using the confusingly similar EXPLORITAS mark.  Elderhostel, through its counsel, replied on October 6, 2009, refusing to comply.  Subsequently, executives from Explorica and Elderhostel met on October 22, 2009 to discuss Elderhostel's rebranding efforts and Elderhostel again refused to comply with Explorica's request to stop using the confusingly similar mark.

same airlines, hotels, transfer agents, etc.  For instance, Explorica does business with at least
fifteen of the hotels identified in the itineraries listed on Elderhostel's website.[3]  *Id.* at ¶ 21.

     Elderhostel also markets itself to the same customer base insofar as the teachers, school
administrators, parents, and other adult travelers who are Explorica's customers are frequently
within Elderhostel's target market.  In addition, Elderhostel touts that it offers approximately 200
international and domestic "intergenerational" educational travel programs with 400 annual
departures for school age children between the ages of 7 and 18 (who travel with a grandparent),
which serve about 7,000 travelers every year.  Jones Decl. at Exs. F – K.

     Elderhostel and Explorica advertise through overlapping marketing channels insofar as
they use the Internet, magazines, placards, and direct and electronic mail to advertise their
services.  Mann Decl. at *Id.* at ¶¶ 5-7, Exs. A – M.  In addition, both parties attend the same
conferences / trade shows and are often discussed together in travel magazines and on popular
travel websites and blogs concerning educational travel.  Olsson Decl. at ¶¶ 24, 26, Exs. H – L.

### C.    Elderhostel's Rebranding Under the EXPLORITAS Mark

     Elderhostel's name change directly reflects a desire to capture a younger market and
overcome inherent limitations in its existing ELDERHOSTEL name: "*The old name Elderhostel
presented a barrier to younger audiences*, yet the (organization's) tagline 'Adventures in
Lifelong Learning' resonated with audiences of all ages."  *See* Jones Decl. at Ex. W (emphasis
added).  Specifically, Elderhostel announced contemporaneous with its rebranding that it was
expanding from its traditional focus on older travelers and lowering its minimum participant age

---

[3] It should be noted that these observations regarding overlap are made without discovery and thus from information
publicly available on Elderhostel's website.  Given the limited options for group bookings in many of the
overlapping destinations, it is likely that discovery in this case will reveal a significantly greater overlap in travel
vendors.

to 21.  As it explained on its website, research revealed that consumers did not like the

ELDERHOSTEL branding and the name evoked strong negative connotations:

> We also learned that the name is ***exceedingly off-putting for a majority of people*** who have no direct attachment to the program—so much so that these ***folks would not even consider a program we offered because the component parts of the name engendered such negative reactions***.

Jones Decl. at Ex. L (emphasis added).

On or about September 22, 2009, Elderhostel announced that it was rebranding as

EXPLORITAS.  Jones Decl. at Ex. M.  Elderhostel also adopted a new logo—a stylized lower-

case "E" in the form of a globe with the horizontal line in the middle of the "e" as the equator—

that is confusingly similar to Explorica's E Design Mark, which also is entirely comprised of a

stylized lower-case "E" with a horizontal axis line.  *See Id.* at Ex. Q; Mann Decl. at ¶ 11.

Elderhostel is now using the EXPLORITAS Mark in a variety of contexts and formats

throughout its business that are similar to the ways in which Explorica employs the

EXPLORICA Mark.  For example, Explorica has an affiliate that uses the name "Explorica

Travel."  Olsson Decl. at ¶ 7.  Elderhostel recently acquired Lyon Travel and rebranded it

"Exploritas Travel Services."  Jones Decl. at Ex. E.  In addition, Elderhostel has recently

launched online social networking features on its web site similar in functionality to Explorica's

Tour Center™ and Tour Diary® applications. *Id.* at Ex. N; Olsson Decl. at ¶ 10.

There can be no doubt that Elderhostel was aware of Explorica and its marks: both parties

compete in a small product market offering the same services from the same city.  Moreover,

senior executives at both parties are personally and professionally known to one another.  *See,*

*e.g.*, Olsson Decl. at ¶ 27.  In any event, by virtue of its federal registrations, Elderhostel was on

constructive notice of Explorica's rights in the EXPLORICA Marks.

**D.     Elderhostel's Conduct is Damaging Explorica—Actual Confusion Has Already Occurred**

Elderhostel's use of a mark and logo that are virtually identical to the EXPLORICA Marks is likely to cause confusion among Explorica's customers and potential customers, vendors, and the general public.  Indeed, actual confusion has already occurred.

First, a customer requested information from Explorica within a week of Elderhostel's name change and spoke to an Explorica customer service representative about booking a trip. Declaration of Kestrel Dunn ("Dunn Decl.") at ¶ 3. [4] The customer said that he had been referred to Elderhostel by an 88 year-old acquaintance who had travelled with Elderhostel before it changed its name.  *Id.* at ¶ 4.  The customer was under the impression that Explorica had previously been Elderhostel.  *Id.*  Hardly a newcomer to the world of educational travel, the customer indicated that he and his wife had planned and led several group trips through EF and NETC—competitors of both Explorica and Elderhostel.  *Id.* at ¶ 3.  Even after it was explained that Explorica had never been Elderhostel, the customer requested and was provided price quotes from Explorica for a Spring 2010 trip for a group of adults.  *Id.* at ¶¶ 4 – 5.  This is a clear-cut example of actual confusion at the customer level.

Second, Explorica recently learned from an Air France representative that a booking confirmation was misdirected and sent to Elderhostel after it adopted the EXPLORITAS Mark. Declaration of Stephane Cosse ("Cosse Decl.") at ¶¶ 3 – 4.  The representative also expressed concern about future confusion due to the similarity of the EXPLORICA and EXPLORITAS marks.  *Id.* at ¶ 5.  Such vendor confusion could result in grave repercussions for Explorica's

---

[4]  This type of evidence is appropriate at this stage of the litigation.  "Affidavits and other hearsay materials are often received in preliminary injunction proceedings.  The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding."  *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986).

customers travelling in the U.S. or abroad, *e.g.*, missed flights, absent hotel reservations, denial

of entry to educational sites requiring reservations, and the inability to be reach travelers in the

event of an emergency.  Olsson Decl. at ¶ 8.  Any confusion by vendors has the potential to

severely damage Explorica's goodwill.  Even a single customer who has a bad travel experience

can cause Explorica to lose substantial business and suffer irreparable harm.  *Id.*

## ARGUMENT

The party seeking a preliminary injunction must demonstrate that (1) the moving party is

likely to succeed on the merits of its claims; (2) absent an injunction, the moving party faces a

substantial risk of irreparable harm; (3) the risk of irreparable harm to the moving party absent an

injunction outweighs the harm to the non-moving party if enjoined; and (4) the injunction is

consistent with the public interest.  *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d

112, 115 (1st Cir. 2006).  The moving party's likelihood of success on the merits, however, is the

"touchstone of the preliminary injunction inquiry."  *Boston Duck Tours, LP v. Super Duck Tours,*

*LLC*, 531 F.3d 1, 11 (1st Cir. 2008) (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670,

674 (1st Cir. 1998).

In this case, Explorica has met these standards, and the Court should preliminarily enjoin

Elderhostel's use of the EXPLORITAS mark for educational travel.  As shown below, Explorica

is the owner of an incontestable federal registration for its EXPLORICA mark, Jones Decl. at Ex.

S, and thus is certain to succeed on the threshold issues of ownership and validity of the Mark.

Given the similarity of the marks in question, there can be no doubt that their use on identical

services will cause confusion.  In the absence of an injunction, Explorica will suffer incalculable

harm because the inevitable consumer confusion will destroy the goodwill Explorica has worked

so hard over the past nine years to build.  Because Elderhostel has done business under another,

well-known name for more than thirty years and just recently rebranded under the confusingly

similar mark, any inconvenience it may suffer by reverting to the ELDERHOSTEL brand pales in comparison to the harm that Explorica will experience (and is experiencing) in the absence of an injunction.  Finally, the public interest is best served by preventing the inevitable consumer confusion that would result from Defendant's use of EXPLORITAS, and in upholding hard-won trademark rights secured through the federal trademark laws and registration regime.

### A.   Explorica Is Likely to Succeed on the Merits of Its Trademark Claims

In order to succeed on the merits of its trademark claims, Explorica must show:  (1) that it is the owner of a protectable mark in EXPLORICA; and (2) Elderhostel's use of EXPLORITAS is likely to cause confusion with that protectable mark.  *See Borinquen*, 443 F.3d at 115-16.

### 1.   Explorica Owns a Valid and Protectable Trademark in EXPLORICA

Explorica's EXPLORICA mark has achieved incontestable status under Section 15 of the Trademark Act (35 U.S.C. § 1065).  *See* Jones Decl. at Ex. S.  As a result, Explorica is entitled to a conclusive presumption that it is the owner of the EXPLORICA mark, and that it is valid and protectable.  *See id.*  Thus, the only question for the Court to consider in deciding likelihood of success is the likelihood of confusion.

### 2.   EXPLORITAS is likely to be confused with EXPLORICA

There is no real question that the two marks in this case are confusingly similar.  The First Circuit has established eight factors to evaluate the potential for a likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the services; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.  *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir. 2004).  Each of these factors weighs in favor of EXPLORICA.

a. ***EXPLORITAS Is Confusingly Similar to EXPLORICA in Sight, Sound, Meaning and Overall Impression.***

In considering the similarity of trademarks, courts must take into account the "total effect" of the marks, examining sight, sound, and meaning, and taking the context of the use into consideration. *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 44 (D. Mass. 1995). Here, the marks are almost identical. The EXPLORITAS Mark is virtually identical and confusingly similar to the EXPLORICA Mark because it is the same coined word, but with only two letters different (a "T" in place of "C" and the addition of an "S"). It is only one letter different when "Explorica" is used in the possessive. They both are four syllable words and have the root "explori." Courts in this Circuit have found that this factor weighs in favor of the plaintiff where the marks are similar in total effect:

> Perhaps on the tongues of linguists or precisionists, variations of articulation could be perceived. However, to the ear of the average person the two names would pass as one. Similarly we believe that few but the discriminating of eye would, upon visual examination, readily perceive the subtle spelling gradation obtaining between the two names.

*Baker v. Simmons Co.*, 307 F.2d 458, 465 (1st Cir. 1962) (SIMMONS and SIMMONDS confusingly similar); *see also Perfection Fence Corp. v. Fiber Composites LLC*, No. Civ. A. 04-12094-GAO, 2005 WL 353017 (D. Mass. Feb. 10, 2005) (PERFECTION and PROFECTION confusingly similar). Here, the likelihood of confusion with respect to the "total effect" is further complicated by the fact that these parties deal with many international vendors. Simply put, the asserted difference between these two marks is certain to be lost in translation.[5] Thus, this factor weighs heavily in favor of Explorica.

---

[5]   In addition to its adoption of a new word mark, Elderhostel has compounded the harm by adopting a new logo prominently featuring a stylized lower-case letter "E", which is confusingly similar to Explorica's long-time logo, which also consists of a stylized lower-case letter "E" (the "E Design Mark"; together with the EXPLORICA Mark, the "EXPLORICA Marks"). *See* Mann Decl. at ¶ 11; Jones Decl. at Ex. Q.

b.  *The Services at Issue Are Identical*

Where services are directly competitive, the degree of similarity needed to find a likelihood of confusion is less than in the case of dissimilar services.  *See Am. Steel Foundries v. Robertson*, 269 U.S. 372, 382 (1926).  Here, the services for which Elderhostel plans to use EXPLORITAS are the same services—educational travel services—for which Explorica uses the EXPLORICA Mark.

Elderhostel unconvincingly claims that it offers different services, *see* October 6, 2009 Letter from Douglas R. Wolf ("Wolf Letter") at Jones Decl. A, but the facts clearly show that the companies are competitors in the educational travel space and everyone except Elderhostel itself considers them to be such.  *See* Olsson Decl. ¶ 26, Exs. H – L.

In any event, any asserted minute differences between the services are legally irrelevant. Consumers will likely believe that the services offered by Explorica and Elderhostel originate from the same company and belong to the same product family.  Courts have held that preliminary injunction is an appropriate measure in circumstances where the services offered under the mark are not identical, but instead merely related.  *See Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 (1st Cir. 1995)(hoof care products); *Aura Commc'ns, Inc. v. Aura Networks, Inc.*, 148 F.Supp.2d 91, 95 (D. Mass. 2001) (wireless communications environment); *Northern Light Tech., Inc. v. Northern Lights Club*, 97 F.Supp.2d. 96, 111 (D. Mass. 2000) (web-based navigation services); *Pub. Svc. Co. of New Mexico v. Nexus Energy Software, Inc.*, 36 F.Supp.2d 436, 439 (D. Mass. 1999)(energy information services); *Jordache Enter., Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 517 (S.D.N.Y. 1993) (greater likelihood of confusion where the junior user's product competes for a slightly different market segment than the senior user).  Thus, even if the service offerings are thinly (and artificially) sliced, this factor still favors Explorica.  *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 30 (1st Cir. 1989).

c. *The Marketing and Trade Channels for the Products Are Identical, and the Customers and Vendors Overlap.*

"The overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together." *Copy Cop*, 908 F. Supp. at 45; *Boston Athletic Ass'n*, 867 F.2d at 30. Where both parties "compete for [the] same customers and advertise in the same media to reach the same customers," then there is a strong likelihood that these factors cut in favor of the plaintiff. *See Copy Cop,* 908 F.Supp. at 45. Such is the case here.

As described more fully in the accompanying declarations, Elderhostel and Explorica use the same marketing and advertising channels. Elderhostel and Explorica advertise in the same places and the same media including direct mailings, catalogues, newsletters, the Internet, and trade publications. *See, e.g.*, Wolf Letter, Jones Decl. at Ex. A; Mann Decl. ¶¶ 5-7, Exs. A – M. Explorica and Elderhostel also appear in the same listings and search results on the Internet, routinely attend the same conferences and trade shows, and are often discussed together in travel magazines and on popular travel websites and blogs concerning educational travel. Olsson Decl. at ¶¶ 24, 26, Exs. H – L.

Explorica and Elderhostel also compete for identical customers. *See Equine Techs.*, 68 F.3d at 546 (affirming a finding of likelihood of confusion where the same group of customers was targeted by both products). Although Elderhostel claims that the "target audiences will not be close in age, goals, experience, and many other factors," that argument is both misleading and unavailing. *See* Wolf Letter, Jones Decl. at Ex. A. As set forth above, there is significant *existing* overlap in the customers served by Elderhostel and Explorica. For example, both parties currently provide adult-focused and intergenerational educational trips. Olsson Decl. at ¶¶ 14 – 17, Exs. E – F; Jones Decl. at Exs. F – K. In the past nine years, Explorica has run 844 group

tours where at least 25% of the travelers were over the age of 50 and nearly 4,000 group tours where at least 25% of the travelers were over the age of 21.  Olsson Decl. at ¶ 15.

Importantly, in addition to the *existing* overlap among travel customers, Explorica's established business plans include focusing on older adult customers in the near future.  Indeed, many traditionally student-focused education travel companies—*e.g*., EF, ACIS, and CHA— have already done so.  *Id.* at ¶ 17.  Materials presented to Explorica's Board of Directors as recently as Spring of 2008 specifically identify the adjacent market of "seniors" as an area where Explorica intends to increase its focus.  *Id.* at ¶¶ 17 – 18.  Under the "natural zone of expansion" doctrine, Elderhostel should not be permitted to prevent Explorica from expanding its consumer base in the future.  *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 874 (2d Cir. 1986) (where trademark owner shows intent to enter the market of the alleged infringer, such a showing is indicative of future likelihood of confusion as to source and the more closely the products compete, the shorter the gap is to bridge).

There are also substantial additional existing overlaps in the marketplace insofar as Explorica depends on key vendors, such as airlines, hotels, and ground transportation providers. These vendors use the EXPLORICA Mark on a daily basis when dealing with Explorica customers on their trips, e.g., signs for airport transportation, signs on buses, signs in hotels. Mann Decl. at ¶ 7.  Exploritas uses the identical vendors in numerous circumstances.  For example, the parties use at least six of the same hotels in Costa Rica alone (Lands in Love, Country Inn & Suites, Hotel Arenal Paraiso, Hotel Punta Leona, Rancho Casa Grande, and Hotel Balamoral).  Olsson Decl. at ¶ 21.

Finally, Explorica's customers include schools and their administrations.  Olsson Decl. at ¶ 12.  As set forth above, Explorica frequently offers its services in conjunction with educational

institutions whose administrations determine whether Explorica will be an approved tour partner. Elderhostel has the same customers given that it also offers programs through numerous colleges and universities that Explorica also does business with. *Id.*

Given these significant and wide-ranging overlaps, the entire marketplace—consumers and vendors alike—is likely to easily mistake Elderhostel's EXPLORITAS offerings with EXPLORICA's educational travel services. Thus, these factors also weigh heavily in Explorica's favor.

### d. *Evidence of Actual Confusion.*

"Although plaintiff 'need not show actual confusion to prevail on its claim for service mark infringement,' such evidence is 'highly persuasive.'" *Operation Able of Greater Boston v. National Able Network*, No. 09-10947-NMG, 2009 WL 2407753, at * 8 (D. Mass. Aug. 3, 2009) (quoting *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1011 (D. Mass. 1988). In the instant case, there is evidence of confusion among consumers, and vendors. A customer was referred to Elderhostel and told it had changed its name; he proceeded to contact Explorica when his intention was to reach Elderhostel under its new name. This is a paradigmatic example of consumer confusion. There is also evidence of actual confusion by mutual vendor Air France, which sent an Explorica booking confirmation to Elderhostel. Such confusion will cause Explorica's customers substantial inconvenience, *e.g.*, missed flights, absent hotel reservations, denial of entry to educational and the inability to make emergency contact. Even a single customer who has a bad travel experience can cause Explorica to lose substantial business and suffer irreparable harm.

### e. *Elderhostel's Prior Knowledge of the EXPLORICA Mark Demonstrates an Intent to Infringe.*

There can be little question that Defendants are fully aware of the EXPLORICA Mark, and have persisted in their plans notwithstanding that awareness. Both companies keep their

headquarters in Boston and executives at each company know each other personally.  Olsson

Decl. at ¶ 27.  Further, Elderhostel hired a law firm specializing in intellectual property prior to

selecting EXPLORITAS and indicated that they had done extensive research and diligence prior

to adopting the EXPLORITAS mark.  *See* Wolf Letter, Jones Decl. at Ex. A.  Thus, Elderhostel

has no plausible argument that it was unaware of the EXPLORICA Mark when it re-branded

using the EXPLORITAS Mark.  *See Perfumania, Inc. v. Perfulandia, Inc.*, 279 F. Supp. 2d 86,

101 (D.P.R. 2003).  At the very least, the incontestable federal trademark registration for

EXPLORICA provided Defendants with constructive notice.  *See* 15 U.S.C. § 1072.

"When one uses a mark similar to one already in use, there is generally an affirmative

duty to avoid the likelihood of confusion."  *Boston Athletic Ass'n*, 867 F.2d at 29; *see also*

*Davidoff Extension S.A. v. Davidoff Comercio E Industria Ltda.*, 747 F.Supp. 122, 131 (D.P.R.

1990); *Malletier v. Lincoln Fantasy*, Civ. No. 03-2277 (JAG), 2006 WL 2129025, *8 (D.P.R.

July 27, 2006) ("[T]here is no excuse for another person to adopt and start using a similar or

identical mark in connection with like products or services.").  Here, Elderhostel ignored its duty

and instead opted to rebrand under a mark that is plainly similar to the EXPLORICA Mark.

Accordingly, the intent factor weighs heavily in favor of finding likelihood of consumer

confusion.

### f.  *The EXPLORICA Mark Is Strong.*

"Various factors are relevant in ascertaining the strength of a trademark, including the

length of time the mark has been used, the trademark holder's renown in the industry, the

potency of the mark in the product field (as measured by the number of similar registered

marks), and the trademark holder's efforts to promote and protect the mark."  *Borinquen*, 443

F.3d at 121.  Here, Explorica has used the EXPLORICA Mark continuously and without

challenge for nine years.  Olsson Decl. at ¶ 5.  Explorica has built a strong reputation in the

educational travel services market worldwide.  *Id.* at ¶¶ 4 – 6.  Explorica is not aware of any other business offering educational travel services using a business name that contains the three-syllable root "explori."  *Id.* at ¶ 25.  Tellingly, if a consumer were to perform a Google search for "educational travel", the first page of results would display no less than 18 different companies. Only two of these companies contains the "explori" root—Explorica and (now) Exploritas.  *Id.*, Ex. K.  Further, Explorica has invested tens of millions of dollars in promoting the EXPLORICA Mark through extensive advertising.  *Id.* at ¶ .  As a result, the EXPLORICA Mark has come to identify Explorica's educational travel services to consumers of such services and people familiar with or doing business within the industry.  Accordingly, the strength-of-the-mark factor tips decidedly in Explorica's favor.

Each factor in the likelihood of confusion analysis weighs in favor of a finding of infringement.  As a result Explorica is likely to succeed on the merits in the instant case and the Court should preliminarily enjoin Elderhostel from using the EXPLORITAS Mark.

### 3.  **Absent an Injunction, Explorica Will Suffer Irreparable Harm**

Once a trademark owner has shown a likelihood of success on the merits, the resulting loss of control over the trademark and the risk to the goodwill and reputation associated therewith "almost inevitably" constitute irreparable injury warranting a preliminary injunction. *Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986).  "[T]rademark infringement by its nature tends to cause irreparable injury because it erodes the goodwill which inheres in the mark."  *Donsky v. Bandwagon, Inc.*, 193 U.S.P.Q. 336, 341 (D. Mass. 1976).  If a trademark holder demonstrates that it is likely to succeed in establishing infringement, then irreparable harm can be assumed.  *See I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998).

The harm that will accrue to Explorica's reputation, goodwill, and brand equity by Elderhostel's use of a confusingly similar mark to provide its educational travel services is immeasurable.  Elderhostel has taken steps to piggyback on the reputation of and goodwill associated with the EXPLORICA Mark (particularly Explorica's strong presence in the younger market which Elderhostel now wishes to enter), and risk destroying that goodwill altogether.  *See Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 699-700 (1st Cir. 1987); *see also Donsky*, 193 U.S.P.Q. at 341.  In addition, the key role that vendors play in this industry makes further, irreparable damage likely.  As detailed above, Explorica is in constant negotiation with vendors and in many cases obtains negotiated discounts, preferred pricing, and unique commercial terms, which Explorica takes care not to disclose to competitors.  Here, where there has already been actual confusion by one vendor—Air France—it is easy to predict that other, inadvertent disclosures by vendors will occur and Explorica may be placed at a commercial disadvantage.

The risk that consumers may associate Explorica with Elderhostel will also irreparably harm Explorica.  Indeed, this so-called "reverse confusion" may damage Explorica above and beyond the damage to the EXPLORICA Mark.  Elderhostel has been quite open about the reasons behind the rebranding: the negative connotation associated with each of the two components of the company's name, "elder" and "hostel."  Confusion among consumers between the EXPLORITAS and EXPLORICA marks will inevitably lead to confusion among consumers and may cause some consumers to turn away from *Explorica* because they mistakenly believe that it is associated with Elderhostel, which will serve in Elderhostel's words, as *a barrier to participation*.  The irreparable injury to Explorica is real and immediate.  The significant goodwill generated by Explorica's long-time investment will be irrevocably damaged

if Elderhostel is permitted to advertise, promote, and sell its educational travel services as

EXPLORITAS.

### 4. **The Balance of Harms Favors Plaintiff.**

Any harm to Elderhostel, in any event, is far less than the irreparable harm to Explorica if

the injunction is not granted.  Elderhostel—despite being fully aware of the EXPLORICA

Mark—decided to spend money in connection with its rebranding under the EXPLORITAS

Mark.  Further, Elderhostel is a large company that had more than $215 million in revenue for

2008.  Jones Decl. at Ex. R.  Elderhostel may now argue that unwinding the rebranding effort

will result in its loss on its advertising investment.  Courts have found this argument unavailing.

*See, e.g.*, *Operation Able*, 2009 WL 2407753, at *9-10 (balance of hardships favored plaintiff

despite defendant's use of confusingly similar mark "for five years at considerable expense.");

*Aura Commc'ns*, 148 F. Supp. 2d at 97-98 (injunction appropriate despite financial harm

defendant).  Balancing the financial outlay by Elderhostel over the last few months against the

huge investment of effort and money that Explorica devoted to developing the Mark over the last

nine years weighs in favor of Explorica.

### 5. **Granting an Injunction Would Be Consistent with the Public Interest.**

There is a public interest in protecting consumers from confusion and deception.  *See*

*Calamari Fisheries*, 698 F.Supp. at 1015.  "In copyright and trademark cases, the public interest

almost always favors the granting of otherwise appropriate injunctions."  *Boustany v. Boston*

*Dental Group, Inc.*, 42 F.Supp.2d 100, 113 (D. Mass. 1999) (internal quotations omitted).

## CONCLUSION

Explorica has demonstrated a likelihood of success on the merits, an immediate threat of irreparable harm if no injunction is issued that outweighs any harm to Elderhostel if the injunction issues, and that the public interest supports the entry of the injunction.  For the foregoing reasons, Explorica respectfully requests that this Court immediately grant a preliminary injunction according to the terms more specifically set out in the accompanying proposed Order.

Respectfully submitted,

EXPLORICA, INC.,

By its attorneys,

Dated: November 3, 2009

/s/ Mark S. Puzella
Mark S. Puzella (BBO No. 644850)
  mpuzella@goodwinprocter.com
Robert M. O'Connell (BBO No. 559667)
  roconnell@goodwinprocter.com
Michael T. Jones (BBO No. 661336)
  mjones@goodwinprocter.com
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Tel: (617) 570-1000
Fax: (617) 523-123